EXHIBIT A

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of October1st, 2015, is made by and between DYNAMIC FORCES, INC. a NJ corporation located at 113 Gaither Dr., Suite 205, Mt. Laurel, NJ   08054 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

## WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books, variant and/or alternative covers of comic books, as well as signed editions of previously published comic books ("Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books ("Graphic Novels"), (iii) science fiction, fantasy and horror novels ("Novels"), (iv) miniature, role playing and collectible card playing games ("Games"), and (v) related merchandise ("Merchandise").   Collectively, physical copies of English-language versions of the Comic Books, Graphic Novels, Novels, Games, and Merchandise are referred to herein as "Products"; and

WHEREAS, Buyer is engaged in the business of, *inter alia*, selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Appointment; Territory.

(a) ·    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of   which generally buy under Buyer's returnable trade terms.

Seller shall retain the right to sell directly into the channels and account types listed in Exhibit D.

(b)     Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Comic Book Specialty Market.   "Comic Book

Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyer's non-returnable trade terms.

(c)     Seller hereby appoints Buyer as its non-exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing games, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer.

(e)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a) and (b), and as Seller's non-exclusive distributor under Paragraph l(c) hereof (collectively, the "Appointments").

2.    Term.  The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for two one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of October 1, 2015, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Term(s).

3.    Supply.

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.  Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.  In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer represents and warrants that it will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)     With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products

may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) ("US Inventory Hub") and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyer's direct cost plus fifteen (15) percent including credit for the original purchase price of Products.

(e)    Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)    Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above

(i)    shall apply to all Seller's titles published during the Term of this Agreement under the Dynamic Forces or Dynamite Entertainment trade dress and identifying as the sole copyright owner either "Dynamic Forces, Inc." or "Dynamite Characters, LLC"

(ii)    shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion;

(iii)    shall not apply to licensed publications based on Seller's IP created through third party publishers; and

(iv)    shall not apply to publications created and sold to a third party for the purpose of being used as a promotional or bonus item free with purchase of an unrelated item.

4.    <u>Distribution Services: Additional Services.</u>

(a)    As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)    Buyer may also elect, in its sole discretion, to offer services to Seller not specified on <u>Exhibit A</u> hereto ("Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such Additional Service plus fifteen percent (15%). Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less twenty percent (20%).

5. <u>Price for Products.</u>

(a)     Seller shall sell Products to Buyer either at the discount specified in Paragraph 5(c), on a net cost basis, (i.e. Seller will notify Buyer at time of solicitation of Products as to what Buyer's unit cost will be for each specific item) or at sixty percent (60%) off the retail price if the Product type is not specified in Paragraph 5(c); and shall grant Buyer a freight rebate of one-quarter of one percent (0.25%) of the wholesale price for all Products received by Buyer in the Continental United States. (the "Freight Rebate").   If Seller produces Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's US Inventory Hub in addition to the assessment of the Freight Rebate.   If Seller engages Buyer in FOB international shipments, Buyer will take care of all transportation, duties, customs clearance and other costs associated with each shipment, and charge back Seller at exact cost plus fifteen percent (15%).

(b)     In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

(c)     The specific purchase discount referred to in Paragraph 5(a) above shall be determined in accordance with the following schedule. Each discount below is defined as the "Applicable Discount", and with respect to Trading Cards the net cost price offered by Seller to Buyer will be considered the retail price. Reorders on products which originally shipped FOB Hong Kong to Buyer will be purchased from Seller by Buyer at fifty percent (50%) off the retail price:

- Comic Books, alternative covers comic books, graphic novels, trade paperbacks, hard covers, limited edition hard cover books, posters - 60% off
- Signed books, Alternate Covers Comics in the Dynamic Forces section of Previews, lithographs, giclees, apparel - 50% off
- Trading cards (net cost per product) - 00% off
- Statues, banks, busts, dioramas, bookends, snow globes, action figures, wall scrolls, and other merchandise - 57% off

6. <u>Payment Terms; Book Market Returns; Etc.</u>

(a)     On a weekly basis and within 10 days after Buyer's unofficial weekly "release date" to the Direct Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).   On a weekly basis and within 10 days after Buyer's unofficial weekly release date to the Book Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount.

(b)     Definitions.
(1)     The "Weekly Payment Amount" shall be equal to the retail value of Net Products sold to Customers multiplied by a percentage equal to 100% minus the Buyer's discount percentage as specified in Paragraph 5(c) [or 40.00% if the Product type is not specified in

Paragraph 5(c)] plus the net cost value of Net Products sold to Customers, <u>less:</u> (i) the Book Market Service Fee (as defined herein), and (ii) the Book Market Returns Fee (as defined herein), if applicable, and (iii) the Freight Rebate, and (iv) for those Customers who require free freight for deliveries by Buyer, a Customer freight fee of one percent (1%) of wholesale, and (v) any Customers' "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C. Buyer will provide Seller, included with each Weekly Payment Amount, a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

        (2)     "Net Products" means the total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers. Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to two and one-quarter percent (2.25%) of the retail price of such Book Market Return.

        (3)     "Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means. When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction"). Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction. Buyer will give 14 days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

        (c)     In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with <u>Exhibit A</u>, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twenty-four (24) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twenty-four month period following the Agreement's anniversary date and is limited to the previous two anniversary years' activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods; or the Seller request is made for the sole purpose of satisfying requirements of a licensor audit and the requested records and reporting are readily available and easily obtainable. Seller, at Seller's sole

expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller.  If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(d)    In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(e)    In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 50% of sales of Products subject to such a reserve during the immediately succeeding twelve (12) months period based on reasonable forecasts. Provided this deduction has been mutually agreed upon to protect both parties in the event of sales to high returns risk accounts.   (Such as Walmart and Target.)

(f)    Seller will have the right to enter into manufacturer and printer Assignment agreements (See exhibit E) with Buyer to the extent that the balance of Assignment amounts still due from Seller to Buyer does not exceed $700,000.   Assignment fees will be a flat charge of $125.00 per production run per item, plus an interest charge prorated based on the length of the assignment to reflect the "One Year" Libor rate plus Three percent (3%) per annum (rounded to the next highest one quarter of a percentage). For example, if the "One Year" Libor rate is .71%, the interest rate of the assignment would be 3.75%/12 = .3125%   The assigned amount plus interest and fees will be withheld from the first weekly payment due to Seller subsequent to 10 days after Buyers initial billing date for the Products associated with the assignment.

All Assignment Balances must be paid in full prior to the expiration of the Initial Term of this agreement.   The right to enter into manufacturer and Printer Assignments will expire with the Initial Term of this agreement and not survive into any renewal terms.   Any assignment balances not paid in accordance with the terms of this Agreement shall begin to accrue interest at one percent (1%) for each month, or any portion thereof, the balance remains unpaid.   For the purpose of clarity, the processing fee noted above is limited to one charge per Assignment agreement, and not one charge per payment.

7.    Credit Decisions.

(a)    Buyer shall make all required credit decisions with respect to Customers

hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

      (b)    Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

      (c)    With respect to Book Market Customers for which Buyer considers to be at additional credit risk, upon notification to Seller, beginning with the next sales transaction forward Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 20.00% of the retail value of the amount of the bad debt. Unless Seller notifies Buyer to cease selling Seller's Products to the at risk Book Market Customer; to the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's deemed costs for any such bad debt and the invoice value related to Seller's Products included in the bad debt. For Book Market Customers for which Buyer has not provided the aforementioned credit risk notification Buyer will assume all responsibility for bad debt without limit.

      (d)    For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.    <u>Title And Risk Of Loss; Inventory.</u>

      (a)    All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

      (b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement. Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

      (c)    Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer represents and warrants that Buyer shall maintain all insurance with respect thereto. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however,

that in the event that "normal shrinkage and deterioration" exceeds two percent (2%) of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as twenty percent (20%) of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer.   The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the two percent (2%) threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business.   All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed twenty percent (20%) of average retail price of units of Products that are lost or damaged.

        (d)    Storage fees will be assessed on a monthly basis and deducted from the weekly payment amount based on the following rate schedules:

| Pieces of saleable Inventory | Storage Fee |
|---|---|
| 0 − 500,000 | $0 |
| 501,000 − 650,000 | $3,500 |
| 651,000 − 750,000 | $5,000 |
| 751,000 − 850,000 | $6,500 |
| 851,000 − 950,000 | $8,000 |

| Hurt Books Pallets | |
|---|---|
| Over 6 months old | $50 per pallet per month |
| Over 1 year old | $100 per pallet per month |
| Over 2 years old | $200 per pallet per month |
| Over 3 years old | Diamond will destroy |

        (e)    Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer but no less than $1200.00 per pallet with the proceeds from this sale divided 55% to Seller and 45% to Buyer when Buyer makes the sale; or 90% to Seller and 10% to Buyer if Seller makes the sale, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 70% to Seller and 30% to Buyer when Buyer makes the sale; or 90% to Seller and 10% to Buyer if Seller makes the sale.   Or in such proportions as mutually agreed on a case by case basis.

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15.00 per order, $ 2.00 per title and $ 0.25 for each piece pick and case pick generated to fulfill the order. SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20.00 per hour for processing any direct to Seller returns which aren't included in No Cost Replacement shipments.

9.     Intellectual Property.

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and TM 20XX DYNAMIC FORCES, INC., All Rights Reserved, All Rights Reserved." Or as otherwise directed by Dynamic Forces, Inc.

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to

time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.     <u>Termination.</u>

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

  i. Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

  ii. Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per Paragraph 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

  iii. A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

  iv. Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

  v. Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

vi.  Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

11.  <u>Effect of Termination.</u>

(a)  Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)  If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to buyer from Seller otherwise due under this Agreement. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)  If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)  Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)  In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for ninety (90) days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Seller's Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to

serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

      (i)    125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

      (ii)    Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer.  Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Seller's Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Seller's Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

      (f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.  If Buyer feels Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.   Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

      (g)    Upon termination of this Agreement and in accordance with Paragraph 3(d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's US Inventory Hub and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyer's direct cost plus ten (10) percent including credit for the original purchase price of Products.

      (h)    Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer. If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

    12.    <u>Notices.</u>  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt

requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

> DYNAMIC FORCES, INC.
> 113 Gaither Dr., Suite 205
> Mt. Laurel, NJ 08054
> Nick Barrucci
> 856-312-1040
> 856-312-1050

If to Buyer:

> Diamond Comic Distributors, Inc.
> 10150 York Road, Suite 300
> Hunt Valley, Maryland   21093
> Attention: Chief Operating Officer
> Fax: (410) 683-7088

or to such other address as either party shall have designated in a notice to the other party. Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.    <u>Release.</u>    By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with Paragraph 6(c).   In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in Paragraph 6(c))

14.    <u>Independent Contractors; No Third Party Rights.</u>    Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller. Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.    <u>Force Majeure.</u>        Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control. The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.    <u>Assignment: Binding Effect.</u> Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this

Agreement to any affiliate organized for the purpose of publishing the Products. Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities. Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement. All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.    Entire Agreement: Modification.    This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto. This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.    Applicable Law.    This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party. In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator. Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction. In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    Survival. All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    Severability.    In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto. However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.   AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)      Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform all of their respective obligations under this Agreement in accordance with its terms.

(b)      Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)      Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)      Seller shall indemnify and hold harmless Buyer, its affiliated companies, its officers, directors, shareholders, employees, agents and representatives,  from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein.  If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall fully cooperate with Seller in the defense thereof.  Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Buyer shall fully cooperate with Seller in the defense thereof.  The foregoing indemnification shall not apply to any Products which have been changed, altered, modified, tampered with or otherwise changed ("Alterations") in whole or in part by Buyer, its officers, employees, agents or representatives, to the extent such any claim, demand, suit, action, prosecution or proceeding would not have been brought but for such Alterations.

(e)      Buyer shall indemnify and hold harmless Seller, its affiliated companies and their respective officers, directors, shareholders, employees, agents and representatives, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) any breach of a representation or warranty set forth herein; or (ii) any breach of any covenant or agreement set forth herein.  If claims are asserted against Seller with respect to which Seller is entitled to indemnification hereunder, Buyer shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Seller's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Seller shall fully cooperate with Buyer in the defense thereof.  Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(f)      The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>    IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.

23.    <u>Confidentiality.</u>  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").  The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.  Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.    <u>Headings and Construction.</u>  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    <u>Counterparts: Facsimile Signature Pages.</u>    This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

EXHIBIT A

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of October, 2015 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

DYNAMIC FORCES, INC.

By: _____

Date: _____

Name: Nick Barrucci

Title: CEO

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Paragraph 2 below).

1.    Buyer shall perform the following marketing services:

(a)    Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)    With respect to the publication referred to in Paragraph 1 (a) above, Buyer shall provide 21 pages for new product listings in the color section per month, 2 ad pages per month in the front section of the catalog starting with July 2015 previews catalog, 8 front gatefolds and 4 back gatefolds per year; all free of charge.   Seller shall also be given the right to purchase available Gatefold cover selections at a net cost per Gatefold of $2,250.   Seller may also purchase additional non-premium pages inside of Buyer's Previews catalog at a rate of $800.00 per page.   In addition, Seller shall have the right to design its own pages in Buyer's monthly Previews catalog.   In the event that Seller does not submit all solicitation materials and advertising within 24 hours of the stated monthly ad deadline; 4 of the free pages in Seller's section will be billed back to Seller at a flat rate of $800.00 per page.

(c)    In the event that Seller is able to achieve both a 4.0% market-share of direct market sales (as reported via Diamond's year end market share charts) and net sales through Diamond of no less than $9,000,000 per contract year, then Seller will be moved to the front of the Diamond Previews catalog (along with the other premier publishers). These thresholds will be reviewed at the end of each contract year and the change to premier status if earned will be taken into account no more than 90-days from the end of the contract year.   No other Seller with identical Appointments will be moved to the front of the catalog at levels less than those stated in this Paragraph.

(d)    Seller may purchase additional advertising space in the publication referred to in Paragraph 1(a) above at 20% off Buyer's published advertising rates.

(e)     Seller shall be given the opportunity to purchase either a Previews front cover (C1) or back cover (C4) if it becomes available once per contact year at the rate card less 20%.   In addition, Seller will be offered the first option on any open Previews Order form or Previews Short Order Form cover spots which aren't previously covered by existing agreements with Buyer's other clients. Seller shall also be given the option to buy any remnant Previews Short Order Form cover spots at a special rate of no more than $1,000 net (no additional discounts would apply).

(f)     Buyer will dedicate no less than two (2) of Seller's Products per month as a Featured Item inside of Buyer's catalog.

(g)     Buyer will grant to seller a flexible marketing allowance of $17,000 per quarter to be used to purchase marketing services and advertising outside of the previews catalog and order form book.   Services and advertising purchased using this marketing allowance will be applied at full rate card value.

(h)     To the extent that Buyer produces a daily web email blast (Diamond Daily) Buyer will grant seller 3 Diamond Daily stories per week at no cost to Seller.

(i)     Seller will be granted the right to include 2 full page ads inside each of Buyer's backlist catalogs which will be billed against the flexible marketing allowance. (assuming Seller has appropriate products and product selection to warrant 2 full pages for each of Buyer's backlist catalogs)

(j)     Solicitation of signed and numbered comics shall be limited to no more than 24 listings per catalog.

2.     Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.     Seller will be allowed to make a presentation to Buyer's customer service department when mutually agreed upon at no cost to Seller.

4.     Buyer will dedicate a minimum of 1 focused sales effort via Diamond's field reps per month at no cost to Seller.

5.     Buyer will dedicate a minimum of 1 focused sales effort via Diamond's inside telephone sales reps per month to be billed against the flexible marketing allowance.

6.     To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

7.     Buyer will supply to Seller reports based on the weekly and monthly sales efforts at no cost to Seller.

8.     To the extent Buyer produces a catalog or advertising booklet for distribution in

the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

9.     Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

10.     The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Vendor in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Vendor shall be accepted by Vendor under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("Diamond") shall place all orders with Vendor by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Vendor shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Vendor notifies the Diamond Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification Diamond will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, Diamond may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event Diamond accepts products on a returnable basis, Diamond reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Vendor a processing fee of $100.

Vendor shall include a packing list with each shipment to include title, Diamond item code, quantity shipped and Diamond's purchase order number.

A scannable bar code must be printed or stickered on all items shipped. At Diamond's sole discretion, items received without a valid scannable bar code may be either returned to the vendor, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the vendor) may be delayed up to three weeks. Vendor shall extend full return privileges to both Diamond and Retailers on all items stickered by Diamond. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Vendor solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

Diamond requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by Diamond in writing, accepted on a fully returnable basis.

Diamond requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, Diamond reserves the right to make the qualifying items returnable to its customers and to pass on the cost of those returns to the Vendor.

In the event Vendor ships product to Diamond which has not been ordered by Diamond, Vendor assumes all risk for the product.   Diamond shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Vendor.   Diamond shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting Diamond's Purchase Order, Vendor hereby warrants to Diamond that (i) it owns all rights to market and sell the products to Diamond as described in the Purchase Order; (ii) said products as delivered to Diamond will be of good and salable quality, and are free of all liens, claims and encumbrances; (iii) said products as delivered to Diamond conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products as delivered to Diamond are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label.   Vendor further agrees to indemnify and hold Diamond, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Vendor of the warranties contained herein or any act or omission of Vendor or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof; provided, however, that the foregoing indemnification shall not apply to any products which have been changed, altered, modified, tampered with or otherwise changed ("Alterations") in whole or in part by Diamond, its employees, agents or affiliates, to the extent such any claim, lawsuit or cause of action would not have been brought but for such Alterations.   In addition to and not in limitation of any rights Diamond may have under this paragraph, by law or statute, in the event a claim or allegation is made against Diamond regarding any of the above or if Vendor breaches the warranties contained herein, Diamond shall have the right, in its sole discretion, to either receive quantities Diamond ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Vendor for a full refund.   Vendor shall reimburse Diamond for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Vendors must be shipped "delivered duty paid (DDP)".   Should failure of Vendor to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Vendor shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Vendor hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Vendor shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.   Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Vendor, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Vendor have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Vendor shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

EXHIBIT A

# Exhibit C
# DYNAMIC FORCES
# Summary of Key Deal Points

| | US & UK CBSM Market | US Book Market | UK Book Market |
|---|---|---|---|
| Product Category | All Categories | All Categories | All Categories |
| Paragraph 5 (a) Base Discount | 60.00% / 50% / net /57% per Paragraph 5 (c) | 60.00% / 50% / net /57% per Paragraph 5 (c) | 60.00% / 50% / net /57% per Paragraph 5 (c) |
| Paragraph 6 (a) Base Days | 10 | 10 | 10 |
| | | | |
| Paragraph 5 (a) Freight Rebate | .25% of wholesale | .25% of wholesale | .25% of wholesale |
| Paragraph 5 (b) Paragraph 6 (a) Book Market Sales Allowance | n/a | .00% | |
| Paragraph 6 (a) Book Market Service Fee (Retail) | n/a | 2.25% | 2.25% |
| Paragraph 6 (a) Returns Cap | n/a | .00% | .00% |
| Paragraph 6 (a) Returns Fees | n/a | .00% | .00% |

Exhibit D

List of Channels and Customers to whom Seller retains the right to sell direct.

- Book Clubs
- Book Fairs
- Scholastic Book Fairs
- Comic Themed Conventions
- Warehouse Clubs
- TV Shopping Programs
- Trading Card Distributors
- Action Figure and Statue Sellers as mutually agreed
- Sideshow Collectibles and sideshowtoy.com
- Custom Comics Buyers
- Art Galleries

EXHIBIT A

Assignment # - - -

**Exhibit E**
**ASSIGNMENT**

This agreement is made on the date shown above among/between Diamond Comic Distributors, Inc. ["Diamond"] of 10150 York Rd., Ste. 300, Hunt Valley, Maryland, 21030; DYNAMIC FORCES, INC. ("DYNAMIC"), of 113 Gaither Dr., Suite 205, Mt. Laurel, NJ  08054 and [Insert Name of Printer or Factory here] of [Insert Address of Printer or Factory here]

**BACKGROUND**

1. Diamond agrees to sell on consignment from DYNAMIC the materials ("Product") and quantities designated as Diamond Item Numbers [Insert Item Number and Product Description Here]   - [Insert Qty to be paid for here].

**THE PARTIES AGREE AS FOLLOWS:**

2.  "Assignment Amount" equals $[insert assignment dollar amount here]

2a. DYNAMIC hereby assigns to [Insert Name of Printer or Factory here] the Assignment Amount shown in Paragraph 2, which is some or all of the amount Diamond shall owe to DYNAMIC as payment for the purchase of consigned goods described in Paragraph 1.  Diamond hereby consents to the Assignment of this amount to [Insert Name of Printer or Factory here] and agrees to pay to [Insert Name of Printer or Factory here] the Assignment Amount by the agreed upon date of **mm/dd/yyyy**, provided that the product as described in Paragraph 1 is acceptable to both Diamond and DYNAMIC in terms of quantity, content and condition, and further provided that the product is made available to Diamond.

2b. DYNAMIC shall send its invoice to Diamond, in the amount of the Assignment Amount, clearly marked "Please remit payment to: [Insert Name of Printer or Factory here].

3. Should DYNAMIC owe any outstanding debt to Diamond, Diamond shall have the right to deduct that amount from the Assignment Amount, and remit only the remainder of the Assignment Amount to [Insert Name of Printer or Factory here].

4. Diamond shall have no duty to pay [Insert Name of Printer or Factory here] any amount other than the Assignment Amount, less any outstanding debt owed by DYNAMIC as described in Paragraph 3.

5. Once Diamond has paid the Assignment Amount to [Insert Name of Printer or Factory here] ,Diamond's obligation shall be considered complete in regards to both [Insert Name of Printer or Factory here], and DYNAMIC for the consignment purchase described in Paragraph 1, and its related Assignment.

5b. As the Assignment described in Paragraph 1 is for consigned goods with no established finite term of sale, Diamond shall deduct the Assignment Processing Fee and the Assignment Amount paid to [Insert Name of Printer or Factory here] from the next available payment due to DYNAMIC 30/60/90 days from issue of the Assignment Amount paid to [Insert Name of Printer or Factory here].

6. Diamond's consent to this Assignment does not relieve DYNAMIC of any liability or responsibility to [Insert Name of Printer or Factory here] under the contract between DYNAMIC and [Insert Name of Printer or Factory here] and DYNAMIC shall be responsible for any default or breach of such contract.

7. DYNAMIC warrants to Diamond that it has made no other Assignment(s) of any type or kind, to any other entity, respecting the products related to this Assignment, and further warrants to Diamond that it will not make any other Assignment(s) until performance of this Assignment is complete.

8. No delays or failure by Diamond to exercise any right under this Agreement or under applicable law, and no partial or single exercise of that right, shall constitute a waiver of that or any other right unless otherwise expressly provided herein.

9. It is agreed that all parties must affix their signatures to this agreement for it to be effective and it is agreed that signed copies of the agreement sent by telephone facsimile (fax) will serve as acceptable documents.

10. Diamond shall have no duty to <u>DYNAMIC</u> or [Insert Name of Printer or Factory here] other than as described above and herein.

11. No provision of this Agreement shall be deemed to change, alter, or modify any terms or conditions of the Purchase Order(s).

12. <u>DYNAMIC</u> shall indemnify and hold harmless Diamond against all liabilities, costs and expenses, including attorneys' fees, for any claim arising from, or in conjunction with, any disputes or litigation arising among/between the parties.

13. Any disputes arising among/between the parties shall be settled under the jurisdiction and venue of the laws and courts of Maryland.

14. <u>DYNAMIC</u> authorizes Diamond to deduct a fee in the amount of $<u>[insert assignment fee amount here]</u> for processing this Assignment.

---

Printed Name          Signature (SEAL)                              Date
AGREED AND ACCEPTED
DIAMOND COMIC DISTRIBUTORS, INC.

---

Printed Name          Signature (SEAL)                              Date
AGREED AND ACCEPTED
[Insert Name of Printer or Factory here]

Printed Name          Signature (SEAL)                              Date
AGREED AND ACCEPTED
<u>DYNAMIC</u>

Revised 03/18/2015

**[TODAY's DATE]**                                              **Assignment # - - -**

**Exhibit F**
**PRINTER VERSION – REDACTED ASSIGNMENT**

This agreement is made on the date shown above among/between Diamond Comic Distributors, Inc. ["Diamond"] of 10150 York Rd., Ste. 300, Hunt Valley, Maryland, 21030; DYNAMIC FORCES, INC. ("DYNAMIC"), of 113 Gaither Dr., Suite 205, Mt. Laurel, NJ  08054 and [Insert Name of Printer or Factory here] of [Insert Address of Printer or Factory here]

**BACKGROUND**

1. Diamond agrees to sell on consignment from DYNAMIC the materials ("Product") and quantities designated as Diamond Item Numbers [Insert Item Number and Product Description Here]   - [Insert Qty to be paid for here].

**THE PARTIES AGREE AS FOLLOWS:**

2.   "Assignment Amount" equals $[insert assignment dollar amount here]

2a. DYNAMIC hereby assigns to [Insert Name of Printer or Factory here] the Assignment Amount shown in Paragraph 2, which is some or all of the amount Diamond shall owe to DYNAMIC as payment for the purchase of consigned goods described in Paragraph 1.   Diamond hereby consents to the Assignment of this amount to [Insert Name of Printer or Factory here] and agrees to pay to [Insert Name of Printer or Factory here] the Assignment Amount by the agreed upon date of **mm/dd/yyyy**, provided that the product as described in Paragraph 1 is acceptable to both Diamond and DYNAMIC in terms of quantity, content and condition, and further provided that the product is made available to Diamond.

2b. DYNAMIC shall send its invoice to Diamond, in the amount of the Assignment Amount, clearly marked "Please remit payment to: [Insert Name of Printer or Factory here].

3. Should DYNAMIC owe any outstanding debt to Diamond, Diamond shall have the right to deduct that amount from the Assignment Amount, and remit only the remainder of the Assignment Amount to [Insert Name of Printer or Factory here].

4. Diamond shall have no duty to pay [Insert Name of Printer or Factory here] any amount other than the Assignment Amount, less any outstanding debt owed by DYNAMIC as described in Paragraph 3.

5. Once Diamond has paid the Assignment Amount to [Insert Name of Printer or Factory here] ,Diamond's obligation shall be considered complete in regards to both [Insert Name of Printer or Factory here], and DYNAMIC for the consignment purchase described in Paragraph 1, and its related Assignment.

5b. As the Assignment described in Paragraph 1 is for consigned goods with no established finite term of sale, Diamond shall deduct the Assignment Processing Fee and the Assignment Amount paid to [Insert Name of Printer or Factory here] from the next available payment due to DYNAMIC 30/60/90 days from issue of the Assignment Amount paid to [Insert Name of Printer or Factory here].

6. Diamond's consent to this Assignment does not relieve DYNAMIC of any liability or responsibility to [Insert Name of Printer or Factory here] under the contract between DYNAMIC and [Insert Name of Printer or Factory here] and DYNAMIC shall be responsible for any default or breach of such contract.

7. DYNAMIC warrants to Diamond that it has made no other Assignment(s) of any type or kind, to any other entity, respecting the products related to this Assignment, and further warrants to Diamond that it will not

EXHIBIT A

make any other Assignment(s) until performance of this Assignment is complete.

8. No delays or failure by Diamond to exercise any right under this Agreement or under applicable law, and no partial or single exercise of that right, shall constitute a waiver of that or any other right unless otherwise expressly provided herein.

9. It is agreed that all parties must affix their signatures to this agreement for it to be effective and it is agreed that signed copies of the agreement sent by telephone facsimile (fax) will serve as acceptable documents.

10. Diamond shall have no duty to DYNAMIC or [Insert Name of Printer or Factory here] other than as described above and herein.

11. No provision of this Agreement shall be deemed to change, alter, or modify any terms or conditions of the Purchase Order(s).

12. DYNAMIC shall indemnify and hold harmless Diamond against all liabilities, costs and expenses, including attorneys' fees, for any claim arising from, or in conjunction with, any disputes or litigation arising among/between the parties.

13. Any disputes arising among/between the parties shall be settled under the jurisdiction and venue of the laws and courts of Maryland.

14. DYNAMIC authorizes Diamond to deduct a fee ████████████ for processing this Assignment.
████████████████

██████████████████████████████████████████
██████████████████████████
███████████████
███

_____          _____
Printed Name          Signature (SEAL)                    Date
AGREED AND ACCEPTED
DIAMOND COMIC DISTRIBUTORS, INC.


_____          _____
Printed Name          Signature (SEAL)                    Date
AGREED AND ACCEPTED
[Insert Name of Printer or Factory here]
_____          _____
Printed Name          Signature (SEAL)                    Date
AGREED AND ACCEPTED
DYNAMIC

EXHIBIT A